[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
 I. INTRODUCTION "Here this extraordinary man [Charles Townsend], then Chancellor of the Exchequer, found himself in great straits. To please universally was the object of his life, but to tax and to please, no more than to love and to be wise, is not given to men. However he attempted it."
Emmund Burke, Speech on American Taxation 19 April 1774.
This Court identifies with Mr. Townsend in attempting to resolve the present dispute. The court finds the fair market value of the personal property which is the subject of the appeal to be $69,003,145 on October 1, 1999.
This is a tax appeal arising out of the valuation of the personal property components of the New Haven Harbor Station Electric Generating Facility. On April 16, 1999, the United Illuminating Company became the first public utility in Connecticut to sell its electric generating facilities pursuant to the state's then recently enacted electric industry deregulation statute. Specifically, United Illuminating sold the CT Page 11677 New Haven station and a station in Bridgeport to Wisvest-Connecticut under a purchase and sale which provided for an aggregate price of $272,000,000 and which agreement allocated $115,726,000 of the price to the New Haven Station. Two million two hundred and seventy four thousand dollars were allocated to spare parts and the balance to the Bridgeport facility. The sale was the end result of a process conducted by Morgan Stanley Dean Witter, the investment banking firm, to solicit potential buyers and to seek the best price for the subject assets. Because United Illuminating was a regulated utility, the sale required the approval of the Connecticut Department of Public Utility Controls. In its decision of March 5, 1999 approving the sale, the Department of Public Utility Controls found the transaction to reflect a reasonable price.
The purchase and sale agreement, while containing a total sales price and an allocation to the Bridgeport and New Haven facilities, did not allocate the price between tangible personal property, real property, fuel inventory, or intangibles.
The allocation of assets to specific categories was made pursuant to a report entitled, "Wisvest-Connecticut Purchase Price Allocation Appraisal Report United Illuminating Company New Haven and Bridgeport Connecticut as of April 16, 1999" which was introduced at trial as defendant's Exhibit 5.
This report formed the basis for the Declaration of Personal property filed by Wisvest-Connecticut, LLC for the grand list of October 1, 1999 which is the subject of the present appeal. Pursuant to that report, with a few minor adjustments, the full market value of taxable property was declared to be $52,988,040. The assessed value, at the agreed upon 70 percent, was $37,091,628. Following the receipt of Wisvest's declaration, the New Haven assessor rendered an assessment on the subject personal property in the amount of $74,273,058 which represented a market value of $106,104,367.
Wisvest appealed this assessment to the New Haven Board of Assessment Appeals which denied the appeal. This action was then commenced by complaint dated May 30, 2000. Following trial, the plaintiff filed a post-trial memorandum dated May 11, 2001. The defendant filed a post-trial memorandum dated June 15, 2001 and the plaintiff filed a reply memorandum dated June 29, 2001. After the filing of all memoranda, the court set down two hours of oral argument allowing each side one hour to summarize its position. All parties agree that assessed valuation of personal property in Connecticut should be 70 percent of fair market value.
The court was presented with numerous estimates of fair market value for the subject property. Those fair market values are set forth as CT Page 11678 follows:
1998 fair market value before appeal: $79,364,337
 1999 fair market value which would have resulted from the earlier United Illuminating stipulation of value: $109,805,479.
 1999 stipulated value removing $14,000,000 which arguably was artificially added to total $95,805,479.
 1999 fair market value as determined by the New Haven assessor, Mr. O'Brien: $106,104,367
 1999 fair market value as declared by Wisvest-Connecticut: $52,988,040
 1999 fair market value as determined by Wisvest-Connecticut expert McDonald: $59,669,778
 1999 fair market value as determined by Wisvest-Connecticut expert Chartier without regard to any reduction for intangibles: $72,632,890
 1999 Chartier value after reduction for intangibles: $58,779,194
 1999 fair market value as determined by New Haven expert Lymaster: $114,000,000
The present dispute is between an assessed value established by the New Haven assessor of $74,273,058 and an assessment which would result from the Wisvest-Connecticut declaration in the amount of $37,091,628.
To begin to understand the various appraisals which are before the court, it is necessary to clarify the concepts of reproduction cost new and replacement cost new. For the sake of a starting point, the court will adopt the definition of these terms contained in the price allocation report, defendant's Exhibit 5 and define the terms as follows:
 "Reproduction cost new is defined as that cost, as of the appraisal date, of any structure, machine unit or process unit reproduced with like materials of construction, capacity or capability at prevailing CT Page 11679 costs for material and labor in the local area. Such a direct reproduction approach is warranted only if it is the most practical and economical method that would be undertaken by a prudent investor. If reproduction in like kind is not physically possible (materials are no longer available) or technically feasible (due to technical advances in the industry), the appropriate cost basis becomes the cost of replacement under the accepted principle of substitution. The principle of substitution, as it applies to the cost approach, is defined as the cost of acquiring an equally desirable substitute property, assuming no undue cost or delay.
 Cost of replacement new is defined as the cost, as of the appraisal date, of a structure, machine unit or process unit based upon the most current technology and construction materials available that will substitute for an existing unit with like capacity, service, desirability and utility. Cost of replacement can also be defined as cost of reproduction new less functional obsolescence due to excess construction."
In Yankee Gas v. City of Meriden, (complex litigation docket at Tolland, April 20, 2001) Judge Thomas Bishop wrote:
 "While a reduction in the value of an asset due to government regulation may appear to be an income concept not properly applied when using cost methodology, on closer scrutiny, the approach provides a useful analysis. As a starting point, it can fairly be said that the original cost of an asset, standing alone, is not a measure of its present worth. But when the economic value of that asset to the business is directly tied to its original cost, then original cost becomes a relevant valuation factor. Such is the case when DPUC regulation, which, as stated previously, uses original cost as the base-point in determining an allowed rate of return. The cost of reproducing or replacing an asset has no such correlation to its economic worth to its business owner. Woolery notes:
 `Reproduction cost new has been widely used as evidence of value of property in unregulated industries. This estimate of cost spans the time period between original construction and the present. It is the cost of constructing a replica of CT Page 11680 the original property using current prices for labor and materials. The very concept is often criticized on both ideological and procedural grounds. There is no assurance that any property is worth what it would cost to reproduce it new using current prices.
 In valuing nonregulated properties, reproduction cost has a wide range of useful applications if used with skill and understanding. However, making this type of cost estimate is expensive and time consuming. Regulatory authorities and courts are inclined to give it little consideration in determining the base for earnings, so tax administrators have little reason to use it as the basis for ad valorem taxation. [Citation omitted] Similarly, with respect to replacement cost methodology, Woolery comments" `Replacement cost, even though it is a useful and reliable tool for valuing properties in a free economy, may have limited utility for valuing transportation and utility property for ad valorem tax purposes. It is expensive, time consuming, and, technically demanding. To use this tool effectively, the transportation or utility property would have to be hypothetically redesigned and reengineered to specifications imposed by the current state of the art and current market demand.'"
 The Handbook for Connecticut Appraisers (2000 ed.) at p. 8-10 contains the following language:
 "It is not recommended that an assessor use trending factors applied against acquisition costs to arrive at an estimate of fair market value. Given the multitude of personal property items to be valued, and the fact that many of them are subject to significant technological obsolescence, these items may actually be replaced with more technologically advanced and, more likely, less expensive equipment. Therefore, the assessor must exercise caution when considering the use of trending factors in that the amount of total depreciation applied is extremely critical in the determination of a final estimate of fair market value."
CT Page 11681 Most of the personal property involved in the present appeal was acquired by United Illuminating in 1975. Both assessor O'Brien and Mr. McDonald, the Wisvest expert, started with historical acquisition cost and applied the trend factors of the Handy-Whitman index to arrive at reproduction cost. In each analysis, the United Illuminating historical cost were $120.7 million. Reproduction cost new were approximately $333,000,000 with a slight variation between the two. Mr. McDonald showed physical depreciation of $152,000,000 while Mr. O'Brien showed depreciation of $228,000,000. The big difference between the two analyses were that Mr. McDonald deducted $106,000,000 for functional obsolescence and $14.9 million for external obsolescence. Mr. O'Brien, although using a significantly higher physical depreciation figure, made no deduction for functional obsolescence or external obsolescence. It is the view of the court that an examination of Mr. O'Brien's analysis and Mr. McDonald's analysis substantiates the problems set forth in Judge Bishop's opinion and in the Appraiser's Handbook. Mr. O'Brien reaches a bottom line figure of $106,000,000. Mr. McDonald reaches a bottom line figure of $59,000,000. The difference lies entirely in the approach to functional depreciation and external obsolescence. The difference in the handling of these items produces a difference of $47,000,000.
The Handbook discourages assessors from utilizing the replacement cost approach which has been used in the instant case. And this Court agrees with Judge Bishop when he wrote:
 "Thus, appraisal practice has markedly changed from 1974 when replacement cost new less depreciation was the normative valuation method. Now it is the exception. Indeed, from trial evidence it is apparent that in all Connecticut municipalities business owners are asked to report their property in terms of acquisition costs less depreciation. In short, tax assessment on the basis of OCLD is now the norm."
There is no question that the purchase and sale agreement provided for an aggregate sales price covering both the Bridgeport and New Haven generating facilities of $272,000,000 and allocated that sales price $115,726,000 to New Haven and $154,000,000 to Bridgeport with $2,274,000 allocated to spare parts.[1]
The court finds no basis for Mr. O'Brien's reallocation equalizing gross sales price between the two facilities. Likewise, although it may or may not be true that the aggregate sales price was reduced because of the State Divestiture Order, it appears to the Court that the sale was made in a commercially reasonable manner with advertising over a reasonable period of time. The court accepts the aggregate sales price as CT Page 11682 a starting point for this fair market value.[2] Moreover faced with the inherent difficulties in using historical cost and trending factors the Court accepts the allocation made by Wisvest for non-property tax purposes as a starting point for property tax valuation. Accordingly, the court starts its examination by accepting as accurate the Wisvest claim that the total New Haven facility has a value of $115,726,000.[3] In defendant's Exhibit 5, prepared by Mr. Chartier for Wisvest, Mr. Chartier subtracts from the New Haven acquisition price $7,043,000 for fuel inventory, $3,002,310 for exempt pollution control equipment, and $33,045,800 for real estate. This leaves a value of the New Haven property of $72,634,890.
The Chartier Report applies a 20% discount for reduced future capacity based upon Wisvest's business expectations,[4] a 16% discount to convert construction costs trended from the Handy-Whitman index to the lower construction costs trended from the Marshall Swift valuation, a 20% discount for technical obsolescence. Although Mr. Chartier uses the Marshall Swift index, rather than Handy-Whitman, his basic approach of establishing a replacement cost and then applying various types of depreciation and obsolescence is in fact not very different from Mr. McDonald's appraisal. Mr. Chartier never makes an independent determination of the value of intangible assets. Rather, applying an approach very similar to McDonald, he arrives at a tangible asset value of $58.7 million and attributes the remainder of the balance to intangible assets. In truth, his determination of intangible assets is no more than a figure needed to balance to the allocated acquisition cost.
The only attempt to directly value intangible assets are in the Speiler report. Upon review of the Speiler and Chartier reports, accountant Kosowsky testified that there were no values assigned separately and there was an absence of any meaningful description. He further testified that in his experience such circumstances indicate that the so-called "intangible assets" cannot be separately allocated or separately valued independent of some other tangible asset. Because the Speiler report does not rely on any recognized method of appraisal and does not comport with any recognized accounting principles for allocating value for intangible assets, the conclusions of the report are not convincing to the court.
 II. CONCLUSION
The court concludes that Wisvest has demonstrated that the personal property at the New Haven generating plant has been "substantially overvalued" by the City of New Haven. The court concludes that both the total acquisition price and the allocation of the total acquisition price to the portion that applies to New Haven is a fair and logical starting point for determining the value of the personal property in New Haven. CT Page 11683 However, the court believes that while Mr. Lymaster and Mr. O'Brien have significantly overvalued the asset Mr. McDonald and Mr. Chartier have somewhat undervalued the asset. The court is not convinced that Mr. Chartier's assignment of value to intangible assets is supported by the evidence. The court finds the fair market value of the personal property located in New Haven between April of 1999 to be $72,634,890. That number should be reduced by 5 percent depreciation for the grand list of October 1, 1999. The court accordingly finds the full fair market value on the grand list to be $69,003,145. The assessed value is $48,302,201. The court would note in passing that the $72,632,890 fair market value on April 16, 1998 bears a reasonable relationship to the original 1998 fair market value of $79,364,337.[5]
By the Court,
 Kevin E. Booth Judge of the Superior Court